FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

JAN 12 2015

JAMES N. HATTEN, Clerk
By: _____ Deputy Clerk

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA,
## Atlanta Division

| | |
|---|---|
| JAMES ARTHUR NORTH and BOBBIE R. NORTH ) ) ) Plaintiffs, ) ) ) v. ) ) UNITED STATES OF AMERICA, ) ) Defendant. ) | Civil Action No. **1:15-CV-0091** |

## COMPLAINT

Plaintiffs James Arthur North and Bobbie R. North, by counsel, state their cause of action against Defendant as set forth below:

### Jurisdiction and Venue

1. This action arises under the Federal Tort Claims Act, 28 U.S.C. § 2671, *et seq.* This Court is vested with jurisdiction to adjudicate this dispute pursuant to 28 U.S.C. § 1346(b).

2. In compliance with 28 U.S.C. § 2675, Plaintiffs James Arthur North ("Mr. North") and Bobbie R. North ("Mrs. North") each filed a separate notice of administrative claim with the appropriate administrative agency – the Department

of Veterans Affairs (the "VA") – which was received by the VA on February 18, 2014.

3. The six month period set forth in 28 U.S.C. § 2675(a) has expired.

4. Accordingly, Plaintiffs' claims are ripe to be litigated in this Court pursuant to 28 U.S.C. § 2675(a).

5. Venue is proper in this judicial district and division pursuant to 28 U.S.C. § 1402(b) because the cause of action arose within the Northern District of Georgia, at the Atlanta VA Medical Center located in Decatur, Georgia (the "Atlanta VAMC").

## General Allegations

6. At all times relevant to this action, Mr. and Mrs. North were legally married and resided in Carrollton, Georgia.

7. At all times relevant to this action, the defendant United States of America owned and operated the Atlanta VAMC.

8. At all times relevant to this action, the agents, servants, employees and personnel of the defendant United States of America were acting within the course and scope of their employment in providing medical care and treatment to Mr. North, a veteran of the United States Armed Forces entitled to such care and treatment.

9. On March 21, 2012, Mr. North was admitted to the Atlanta VAMC to undergo a right total knee replacement. He remained an inpatient at the Atlanta VAMC until April 11, 2012.

10. Mr. North had previously undergone a left total knee replacement in February 2011.

11. Mr. North's pre-operative exam was performed on March 5, 2012 at the Atlanta VAMC by Andrew M. Doll, PA-C ("Mr. Doll").

12. Notably, Mr. Doll documented that Mr. North's right dorsalis pedis ("DP") and posterior tibial ("PT") pulses were each "2+."

13. On March 21, 2012, Mr. North's right total knee replacement was performed by Greg Erens, M.D. ("Dr. Erens"), who was assisted by Harlan Starr, M.D. ("Dr. Starr"), Jean-Gerald Nougaisse, PA-C ("Mr. Nougaisse"), Mark Daniel, PA-C ("Mr. Daniel") and John Gerard, PA-C ("Mr. Gerard"). No complications were reported.

14. Mr. North's surgery commenced at 8:47 A.M., and he arrived in the Post Anesthesia Care Unit ("PACU") at approximately 12:05 P.M.

15. At or about 2:30 P.M., Mr. North experienced a change in the perfusion of his right lower extremity. Mr. North's right DP pulse was absent upon evaluation. His right PT pulse was dopplerable, and his right foot was

mottled and cold to the touch as compared to his left foot and to previous assessments.

16.     At or about 2:31 P.M., Dr. Starr was notified that Mr. North had lost his right DP pulse and that his right foot was mottled and cold to the touch as compared to his left foot and to previous assessments.

17.     John Louis-Ugbo, M.D. ("Dr. Louis-Ugbo") evaluated Mr. North at bedside in the PACU at or about 2:55 P.M., noting that his right DP and PT pulses had become palpable.

18.     Despite the change in perfusion of his right lower leg, no vascular consultation or imaging studies were ordered for Mr. North at this juncture.

19.     Post-surgery and prior to Mr. North's admission to the floor at or about 4:03 P.M., Dr. Starr documented that Mr. North's right DP pulse was faintly palpable while his PT pulse was not palpable but was strongly dopplerable.

20.     Dr. Starr further noted that the nursing staff would monitor Mr. North's right foot perfusion hourly and were to call the physician if there were any concerns.

21.     Dr. Starr did not enter an order in Mr. North's chart regarding hourly nursing checks of Mr. North's right foot perfusion.

4

22. Mr. North was admitted to the 9th floor and Patient-Controlled Analgesia ("PCA") morphine was prescribed to control his pain.

23. At or about 7:56 P.M., Mr. North underwent a nursing admission assessment conducted by Victor D. Urbani, R.N. ("Mr. Urbani"). No limb assessment of Mr. North's right lower extremity was performed or documented at this time.

24. Mr. Urbani noted, at or about 11:46 P.M. and 11:50 P.M., respectively, that Mr. North was alert and oriented, not complaining of discomfort, and that his pain level was "3/10." No limb assessment of Mr. North's right lower extremity was performed or noted by Mr. Urbani in either of these chart entries.

25. At 12:10 A.M. on March 22, 2012, Kate Ellen Dillow, B.S.N., R.N. ("Ms. Dillow") documented that there was 6 mL of morphine remaining in Mr. North's PCA morphine syringe. Mr. North's "PCA & EtCo2 Flow Sheet" instructed the provider to "keep pain intensity <4," yet Ms. Dillow noted that Mr. North's pain was 6 of 10 at this time. Ms. Dillow neither reported Mr. North's complaints of pain to the physician nor did she take further steps to alleviate his pain.

26. At or about 12:17 A.M., Mr. Urbani noted "continue to check cap[illary] refill on bilateral lower legs" and that Mr. North's "bilateral lower legs remain

warm." No further evaluation of Mr. North's right lower extremity, such as the presence or absence of DP and PT pulses, his ability to feel or move his foot and toes, the color of the foot, or other factors, was noted at this time.

27. Ms. Dillow assessed Mr. North at or about 12:20 A.M., noting that he was in bed sleeping and easily awakened, that he was reporting pain in his right knee "6/10," and that a "family member" was at his bedside.

28. Despite Mr. North's complaints of pain, Ms. Dillow did not call the physician at this time and noted only that Mr. North was "receiving PCA morphine for pain control" and "PCA pump operational." She took no further actions to determine the source of Mr. North's pain, to assess his lower right extremity, or to alleviate his pain.

29. Ms. Dillow noted that the morphine in Mr. North's PCA pump had run out at or about 2:04 A.M. Mr. North was complaining of 10 of 10 pain at this time.

30. Though the medical records reflect that morphine was ordered for Mr. North at this time, there are no additional PCA & EtCo2 Flow Sheets in his medical records.

31. Despite Mr. North's complaints of a maximum level of pain, Ms. Dillow did not take any additional steps to alleviate his complaints of pain. Ms.

Dillow further failed to notify a physician of these complaints and did not assess Mr. North's lower right extremity for signs of perfusion.

32. Other than an IV check at or about 3:56 A.M., Ms. Dillow did not evaluate Mr. North to attempt to further alleviate his pain, to determine the cause of his pain, or to perform an assessment of his right lower extremity from 2:04 A.M. until 7:00 A.M.

33. Mrs. North was present with Mr. North at the Atlanta VAMC during the overnight period from March 21, 2012 through March 22, 2012. She was told by nurses that no Doppler was available to check Mr. North's lower right extremity pulses. Further, Mrs. North observed Mr. North's complaints of excruciating pain throughout the overnight period.

34. At or about 7:00 A.M., Ms. Dillow noted that Mr. North was experiencing 8/10 pain and that his right leg was "slightly cooler than [his] left leg." Ms. Dillow palpated a weak right pedal pulse for a small amount of time but did not use a Doppler in her evaluation.

35. Despite Mr. North's status as less than 24 hours post-total knee replacement, at no point prior to this time did Ms. Dillow assess Mr. North's right lower extremity.

36.     In disregard of her findings of Mr. North's compromised lower right leg perfusion, Ms. Dillow took no further action. She documented "[n]o change in assessment" and did not call a physician to assess Mr. North.

37.     At or about 7:40 A.M., Stephen C. Hamilton, M.D. ("Dr. Hamilton") evaluated Mr. North, noting that he had complained of pain overnight. Dr. Hamilton further noted that Mr. North's bandage was clean, dry, and intact and that his foot was warm and well-perfused. Dr. Hamilton did not document the presence or absence of Mr. North's lower right extremity pulses, and, further, did not use a Doppler to evaluate the same. Further, Dr. Hamilton did not order imaging studies or a vascular consultation at this time.

38.     At or about 8:15 A.M. on March 22, 2012, Traci M. Williams, B.S.N., R.N. ("Ms. Williams") noted that Mr. North was tearful, upset, and screaming in pain. Ms. Williams noted Mr. North verbalized that his pain was greater than 10 on a 1 to 10 scale in his right hip, calf and knee, consistent with his documented complaints of pain and Mrs. North's observations. Mr. North stated that his pain medication had not been working all night.

39.     Ms. Williams documented that, according to the PCA history, Mr. North had received eleven milligrams of morphine with *332* self-administration attempts.

40. Dr. Hamilton assessed Mr. North at or about 8:49 A.M., noting 10/10 pain, mild knee effusion, and mild swelling of his thigh and calf compartments.

41. At this point in time, Mr. North's right lower extremity pulses were not palpable, while his PT pulse was dopplerable. Dr. Hamilton documented this in the medical record and ordered a vascular consultation and computed tomography angiogram ("CTA") for Mr. North at this juncture.

42. From Mr. North's discharge to the floor at or about 4:00 P.M. on March 21, 2012 until Dr. Hamilton's second evaluation of Mr. North at or about 8:49 A.M. on March 22, 2012, no Doppler was used to assess Mr. North's right lower extremity pulses.

43. At or about 9:18 A.M., Dr. Hamilton noted that Mr. North's pain was not relieved with 4 mg of IV morphine.

44. Ms. Williams noted at or about 9:30 A.M. that Mr. North did not receive relief from his pain and was pleading with his physician for help.

45. At or about 11:00 A.M., VAMC records reflect that Mr. North continued to yell out in pain "10/10."

46. Ms. Williams further noted that Mr. North's physician was asked to order a dose of breakthrough medication because the PCA dose was not available.

47. At or about 11:23 A.M., Mr. North was evaluated by Michael D. Bryant, M.D. ("Dr. Bryant") and Yazan Duwayri, M.D. ("Dr. Duwayri") for decreased pulses in his right lower extremity. Mr. North complained of excruciating pain in his back, right hip, right posterior calf, and the top of his right foot during this evaluation. Mr. North's right leg was slightly cooler than his left foot.

48. Regarding Mr. North's lower extremity pulses, Dr. Bryant and Dr. Duwayri noted that Mr. North's DP and PT pulses were palpable on his left foot, that they observed a biphasic signal on Mr. North's right PT, but that there was no right DP signal.

49. As reflected in VAMC medical records and based on the findings of their assessment, Dr. Bryant and Dr. Duwayri were concerned that Mr. North had sustained a vascular injury or was experiencing compartment syndrome. Dr. Bryant and Dr. Duwayri's final decision was to await the results of Mr. North's CTA prior to scheduling a surgical intervention.

50. At or about 11:50 A.M., and as indicated in Ms. Williams' note, Mr. North continued to scream in pain.

51. Pain in the lower leg and foot, diminished sensation in the lower leg and foot, decreased temperature in the lower leg and foot as compared to the

patient's other limb and prior evaluations, swelling, and decreased capillary refill are all recognized signs and symptoms of ischemia following a total knee replacement procedure.

52. The CTA of Mr. North's right lower extremity revealed a complete occlusion of Mr. North's right popliteal artery just below the level of the knee joint. Reconstituted flow via collaterals in the right posterior tibial artery, amounting to the only single run-off to the right foot, was also visualized. The right anterior tibial artery and the right peroneal arteries were not able to be visualized by the vascular surgery team on the CTA.

53. The CTA confirmed that Mr. North was suffering from ischemia due to popliteal artery thrombosis.

54. Mr. North, having arrived back to the floor from his CTA, was diaphoretic and groaning at or about 1:30 P.M., as noted by Ms. Williams.

55. At or about 1:44 P.M. and after reviewing Mr. North's CTA with a radiologist, Dr. Hamilton noted his concern for vascular injury at the level of his popliteal artery. Dr. Hamilton further documented the plan for "on-table angio with vascular surgery" at this juncture.

56. In his pre-operative note, Dr. Bryant explained that Mr. North would undergo angiogram, possible right lower extremity arterial bypass, possible thrombectomy, and possible fasciotomies during the planned vascular procedure.

57. At or about 2:25 P.M., Mr. North's right pedal pulse was able to be palpated for only a small amount of time and his right lower extremity was slightly cooler than his left.

58. At or about 2:31 P.M. and prior to his vascular reconstruction procedure, Dr. Duwaryi's sensory evaluation of Mr. North's right leg revealed diminished sensation from the mid-calf downward, diminished motor function at the right ankle, and a weak right posterior tibial artery signal. Mr. North's capillary refill time was two seconds.

59. Mr. North's right PT signal was dopplerable and his right DP was absent during this evaluation, while his femoral pulses were strong and his left DP was palpable. Further, Mr. North denied any chronic symptoms of vascular insufficiency.

60. Dr. Duwayri's note reflected his belief that Mr. North had suffered from suspected prolonged ischemia.

61. Mr. North underwent vascular surgery from approximately 4:16 P.M. on March 22, 2012 until 3:10 A.M. on March 23, 2012.

62. As reflected in the operative note, Mr. North's pre- and post-operative diagnosis was, in fact, acute right leg ischemia.

63. Vascular surgeons, including Dr. Duwayri, Matthew Corriere, M.D. ("Dr. Corriere"), and Siddharth Patel, M.D. ("Dr. Patel"), performed a right lower extremity angiogram and attempted a right leg thromboembolectomy. A vein patch angioplasty of the right popliteal artery, as well as a right popliteal to tibioperoneal bypass with reverse saphenous vein graft and right popliteal to posterior tibial bypass with reverse saphenous vein graft, were also performed. Mr. North underwent a right leg four compartment fasciotomy during the reconstruction procedure. Further, Mr. North's right anterior and lateral compartment muscles were found to be dusky and noncontractile, with pink viable right posterior compartment tissue.

64. Of note, the operative note further reflected that Mr. North had been complaining of persistent right leg pain since his total knee replacement procedure and that his "prolonged ischemia (24 hours)" prior to vascular surgery would produce a functional outcome of the right leg that would not be "as good."

65. Following Mr. North's vascular reconstruction procedure, Dr. Hamilton entered an order for Mr. North's lower right extremity pulses to be

checked hourly. As noted previously, no such order was entered following the right total knee replacement procedure on March 21.

66. Mr. North subsequently underwent several procedures to irrigate and debride his right lower leg on March 27, 2012, March 29, 2012, April 3, 2012, and April 9, 2012. During each of these procedures, additional portions of Mr. North's right lower leg muscle were debrided. As a result, Mr. North lost a significant portion of the muscle in his lower right leg.

67. On April 11, 2012, Mr. North was admitted to the Atlanta VAMC's Community Living Center Unit ("CLC") for rehabilitation and skilled nursing care. His recovery was complicated by necrosis of his tibial tubercle, septic arthritis of the knee, and chronic non-healing wounds.

68. Mr. North underwent arthroscopic irrigation and debridement of his right knee at the Atlanta VAMC on May 18, 2012.

69. Mr. North has not recovered well since his total knee replacement, popliteal artery injury, ischemia, and vascular reconstitution procedure. Prior to the right total knee replacement surgery, Mr. North was able to ambulate save his knee occasionally giving out. As a result of the loss of a significant portion of his lower right leg muscle, Mr. North's ability to walk has been compromised. Mr.

North has required emergency treatment for falls as a result of his compromised mobility and suffers from right foot drop and knee and ankle contractures.

70. Mr. North is now forced to use a power wheelchair when he leaves his home. He can walk no more than a few feet without falling. Mr. North has become understandably depressed as a result of his injury and loss of mobility.

71. As a result of Mr. North's condition, Mr. and Mrs. North's marital relationship has suffered. Because of Mr. North's physical injuries, Mrs. North has become Mr. North's primary caretaker, as well as solely responsible for the upkeep of the couple's farm. Mr. North is no longer able to provide the conjugal affection to Mrs. North that was once possible. Further, Mr. North's change in mood and affect has had an impact on his marital relationship

## COUNT I - Negligence

72. Plaintiffs restate and re-allege paragraphs 1 through 71 as if fully stated herein.

73. As a provider of medical services to Mr. North, Defendant and agents, servants, or employees of the United States of America at the Atlanta VAMC owed Mr. North a duty to provide him medical care consistent with the governing standard of medical care.

74. Plaintiffs allege that the agents, servants, or employees of the United States of America at the Atlanta VAMC, while acting within the scope of their employment, violated the applicable standards of medical care by:

(a) Negligent failure to take appropriate action in the face of the Mr. North's overall clinical presentation;

(b) Negligent failure to appropriately assess Mr. North's lower right leg from approximately 4:00 P.M. on March 21, 2012 until 8:49 A.M. on March 22, 2012;

(c) Negligent failure to notify the appropriate attending physician or house officer of Mr. North's complaints of extreme pain and his efforts to control that pain with his hand-held PCA pump during the overnight period of March 21-22, 2012;

(d) Negligent failure to order appropriate imaging studies prior to 8:49 A.M. on March 22, 2012;

(e) Negligent failure to order consultation with orthopedic surgery prior to 7:40 A.M. on March 22, 2012;

(f) Negligent failure to order consultation with vascular surgery prior to 11:23 A.M. on March 22, 2012;

(g) Negligent delay in ordering vascular reconstructive surgery for Mr. North, despite his classic presentation of ischemic injury;

(h) Negligent delayed diagnosis of and treatment for Mr. North's post-operative popliteal artery injury;

(i) Negligent delayed diagnosis of and treatment for Mr. North's post-operative ischemia and resulting injury;

(j) Negligent delayed diagnosis of and treatment for Mr. North's post-operative compartment syndrome; and

(k) Committing other negligent acts or omissions before, during and/or after the course of the treatment referenced above as will be developed through additional factual investigation, expert review, and discovery.

75. As a direct and proximate result of the aforementioned negligence of agents, servants, and/or employees of the United States, Mr. North was caused to suffer physical injury, pain, mental anguish and physical disability. He has additionally incurred economic damages as a result of his disability.

76. Accordingly, Plaintiff Mr. North claims the following damages:

(a) Compensation for the physical injury and disability suffered by Mr. North;

(b) Compensation for extreme pain, suffering, and mental anguish of Mr. North;

(c) Compensation for economic losses sustained as a result of Mr. North's injury; and

(d) Compensation for any other damages sustained by Mr. North as a proximate result of the Defendant's negligent acts.

77. For these damages, Plaintiff James Arthur North demands $5,000,000.00 (Five Million and 00/100 Dollars) in compensation.

## COUNT II - Loss of Consortium

78. Plaintiffs restate and re-allege paragraphs 1 through 77 as if fully stated herein.

79. As the legal spouse of Mr. North – both at the present time and at the time agents and/or employees of the United States breached the standard of care – Mrs. North maintains a derivative claim to recover compensation for her loss of consortium and other injuries.

80. As a direct and proximate result of the aforementioned negligence of agents and/or employees of the United States in their treatment of James Arthur North, Plaintiff Bobbie R. North suffered various damages. Accordingly, Mrs. North claims damages for loss of consortium, including:

(a) Loss of Mr. North's love, society, affection, comfort, cooperation and companionship;

(b) Impairment of intimate marital relations;

(c) Economic loss resulting from the injury to Mr. North;

(d) The value of the lost household and domestic services previously performed by Mr. North;

(e) The value of the farm labor previously performed by Mr. North, currently being shouldered by Mrs. North; and

(f) Any other pecuniary and non-pecuniary loss proximately resulting from his injury.

81. For these damages, Plaintiff Bobbie R. North demands $1,500,000.00 (One Million, Five Hundred Thousand and 00/100 Dollars) in compensation.

82. Submitted herewith are the Affidavits of Grace G. Lewis, R.N., M.S. and Louis C. Almekinders, M.D. These affidavits include the opinions of well-qualified experts competent to testify on the matters at issue in this case and set forth specifically one or more negligent acts and/or omissions claimed to exist and the factual basis for each such claim. These affidavits fulfill the pleading requirements of Georgia law as set forth at O.C.G.A. Sec. 9-11-9.1, but that law is not applicable to the claims in this lawsuit, which arise under federal law. These

19

expert affidavits are submitted out of an abundance of caution and to demonstrate a good faith and substantial factual basis for the Plaintiffs' claims in this matter.

WHEREFORE, Plaintiffs respectfully request that this Court grant judgment in their favor against Defendant as prayed for above and award them such other further relief as is just and equitable under the circumstances.

Respectfully submitted, on behalf of JAMES ARTHUR NORTH and BOBBIE R. NORTH, this _____ day of January, 2015.

Fain, Major & Brennan, P.C.

By: _____
Dale C. Ray, Jr.
Georgia Bar No. 596095

100 Glenridge Point Parkway, Suite 500
Atlanta, GA 30342
(404) 688-6633
(404) 420-1544 – Facsimile
dray@fainmajor.com